AO 106 (Rev. 06/09) Application for a Search Warrant

*FILED*

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

SEP 11 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

In the Matter of the Search of

7325 S. Utica Avenue, Apt. 1001
Tulsa, Oklahoma

)
)
)
)
)

Case No. 19-mj-181-JFJ

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____Northern_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)    Drug Conspiracy | |

The application is based on these facts:

See Attached Affidavit by Taylor Wilson, SA/DEA

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Taylor Wilson, SA/DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9-11-19__

City and state: __Tulsa, OK__

_____
*Judge's signature*

US Magistrate Judge Frank H. McCarthy
*Printed name and title*

## AFFIDAVIT FOR SEARCH WARRANT

Taylor Wilson, being duly sworn under oath, states as follows:

1.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been a DEA Special Agent since October 2015. I am currently assigned to the Tulsa Resident Office (TRO), in Tulsa, Oklahoma, and I am an "investigative or law enforcement officer" of the United States as defined in 21 U.S.C. § 878(a). I was previously employed with Customs and Border Protection (CBP), Department of Homeland Security. I worked as a CBP Officer for approximately two years. During my law enforcement career, I have received over 1,500 hours in specialized training from various federal law enforcement agencies. This training has focused upon methods of unlawful manufacturing of illegal narcotics via clandestine laboratories, the installation and monitoring of global positioning satellite (GPS) trackers, Title III wire interceptions, smuggling and distribution techniques, methods of drug trafficking, as well as the means by which drug traffickers derive, launder and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations. I have gained a considerable amount of knowledge about drug trafficking organizations and their members through my training and experience. During the course of my training and interviews with various defendants I have learned how individuals involved in drug

distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

2.      Based on my experience as a Special Agent with the Drug Enforcement Administration (DEA), I also know that those involved in international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and that they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications.

3.      Through my employment as a Special Agent with the Drug Enforcement Administration (DEA), I have gained knowledge in the use of various investigative techniques, including the use of wire and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover investigators, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

4.      The information contained in this affidavit is known personally by me and/or was learned by me from other officers or agents, witness interviews or by reviewing reports and documents. Since this affidavit is being submitted for the limited

purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a search warrant for the described premises, I have not included each and every fact known to me and others regarding the investigation of this matter. I have set forth only the facts that I believe are necessary to establish probable cause. I base my belief that financial and documentary evidence related to the transportation, sale and/or distribution of illegal controlled substances will be recovered based on the information contained within this affidavit.

5.     Based on my background, training and experience, as previously detailed in this affidavit, I know:

a.     Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.     Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.     Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

d.     Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of controlled substances;

e.     Drug traffickers often keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained

where drug traffickers have ready access to them, i.e., on their persons, in their vehicles, in or about their residences and places of business. These documents are often kept in code to secret their meaning from law enforcement;

f.     It is common for drug traffickers to hide contraband, proceeds of drug sales, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions, records and evidence of drug transactions relating to transferring, hiding or spending large sums of money made from engaging in drug trafficking in secure locations on their persons, within their vehicles, within or around their residences and businesses for ready access or to conceal them from law enforcement authorities;

g.     When drug traffickers collect proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations and business frauds;

h.     Drug traffickers commonly maintain names, addresses and telephone numbers in books or papers for their associates in the trafficking organization. These books or papers include such items as address books, telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, sellers, weights and other details of the drug traffickers;

i.     Drug traffickers hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that the courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, drug trafficking;

j.     The aforementioned books, records, receipts, notes, ledgers and other items mentioned above, are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k.     Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l.      Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs.  This paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.      Drug traffickers often keep hand guns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

n.      Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

o.      Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities;

p.      Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

q.      Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits.  Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity.  Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

6.      Based upon my training and experience, and information related to me by

agents and others involved in the forensic examination of computers, I know that

computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks, magnetic tapes, memory chips, cellular telephones, iPads and other portable electronic devices. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.     The aforementioned facts most commonly necessitate the seizure of computers, cellular telephones, iPads and other portable electronic devices and all related computer equipment in order to conduct a search by Forensic Examiners in the well-equipped and controlled environment of a laboratory setting.

7.     This affidavit is made in support of an Application for Search Warrant and Search Warrant for the premises described in Attachment "A."

8.     As a result of my participation in the investigation of matters referred to in this affidavit, and based upon reports made to me by other law enforcement agencies and witnesses, I am familiar with the facts and circumstances of this investigation.   The property and vehicles to be searched is described in Attachment "A." Attachment "B" is a list of items for which authority is sought to search and seize. Since this affidavit is presented to support an application for a search warrant of the premises described on Attachment "A." I have not included each and every fact I know concerning this investigation. However, I have set forth the facts that I believe are essential to establish the necessary foundation and probable cause to support the Application for Search Warrant and Search Warrant for the property to be searched described in Attachment "A."

## **BACKGROUND**

9.     Since June 2019, members of the DEA Tulsa Resident Office (TRO), FBI Tulsa, and the Tulsa Police Department (TPD) Special Investigation Division (SID) have been investigating a heroin drug trafficking organization (DTO) operating in Tulsa, Oklahoma. During this investigation, investigators have identified Pablo Soriano-Villareal to be the cell-head of the DTO in Tulsa, Oklahoma. Investigators have identified Soriano-Villareal to deliver bulk cash drug proceeds to couriers and to receive kilogram quantity shipments of heroin. Also during this investigation, investigators have identified Felix Gil-Cardenas, David Hernandez-Perez, and Diego Carrillo-Lopez as

Tulsa-based couriers that work for Soriano-Villareal. During the course of this investigation, there have been multiple controlled purchases of heroin by undercover officers as well as currency received from the sale of these illegal narcotics.

10.     Moreover, during the course of this investigation, investigators came to believe Soriano-Villareal utilizes **11324 East 22nd Street, Apt. 10, Tulsa, Oklahoma**, and **7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma**, to store quantities of heroin and currency derived from the distribution of heroin. Additionally, investigators believe that up until they recently abandoned the apartment, Hernandez-Perez, Carrillo-Lopez, and Soriano-Villareal utilized 11325 East 23rd Street, Apt. 6, Tulsa, Oklahoma, to store quantities of heroin and currency derived from the distribution of heroin. Investigators believe that Hernandez-Perez, Carrillo-Lopez, and Soriano-Villareal are still utilizing **7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma**, for those purposes. Investigators were able to document money laundering and drug distribution involving this DTO.

11.     Investigators have also obtained Tulsa County, State of Oklahoma, court Orders authorizing investigators to place GPS tracking devices on the following vehicles: Soriano-Villareal's white Dodge Avenger, Carrillo-Lopez' black Hyundai Azera, Hernandez-Perez' gray Ford Fusion, and Gil-Cardenas' silver Hyundai Elantra.

## PROBABLE CAUSE IN SUPPORT OF SEARCH WARRANT

12.     On June 27, 2019, members of the DEA Oklahoma City District Office (OKC) contacted members of the DEA TRO and advised that a DEA Confidential Source (CS) had been offered a contract to coordinate a money pick-up in Tulsa, Oklahoma. On that same date, a law enforcement officer, acting in an undercover capacity (UC-1) met with a Hispanic male, later identified as Soriano-Villareal, in Tulsa, Oklahoma. During the meeting, Soriano-Villareal provided UC-1 a gift bag that contained $70,000 U.S. Currency. The $70,000 U.S. Currency was packaged in numerous bundles and wrapped in rubber bands. Based on my training and experience, I know drug traffickers to frequently package bulk cash drug proceeds in this fashion.

13.     Following the bulk currency pick-up described above, investigators identified Soriano-Villareal to reside with Gil-Cardenas at 7329 South Utica Avenue, Apt. 1014, Tulsa, Oklahoma.

14.     On July 9, 2019, investigators conducted surveillance on Soriano-Villareal. At approximately 10:19 a.m., investigators observed Soriano-Villareal had departed from his residence at 7329 South Utica Avenue, Apt. 1014, and observed him travel to the Country Inn and Suites, located in Tulsa, Oklahoma. Upon arrival to the Country Inn and Suites, investigators observed Soriano-Villareal enter into the hotel carrying a plastic wrapped rectangular object shaped like money. Soriano-Villareal was observed entering

9

into room 201. A few minutes later, investigators observed Soriano-Villareal walk out of room 201 carrying a large duffel bag. Based on the appearance of duffel bag, the duffel bag observed to be weighted. Soriano-Villareal proceeded to enter into his white Dodge Avenger and depart from the hotel. Investigators observed Soriano-Villareal return to his residence at 7329 South Utica Avenue, Apt. 1014.

15.     Based on my training and experience and my knowledge of this investigation, I believe Soriano-Villareal met with a heroin courier at the Country Inn and Suites. Additionally, I believe Soriano-Villareal delivered a courier payment, which was contained in the plastic wrapped object that Soriano-Villareal was observed carrying inside of the hotel. Furthermore, I believe Soriano-Villareal received a multi-kilogram shipment of heroin from the courier, which was concealed in the large duffel bag.

16.     On July 10, 2019, investigators conducted surveillance on Soriano-Villareal. During the surveillance operation, investigators observed Soriano-Villareal travel to the Village East Apartment Complex and enter into an apartment located at **11325 East 23rd Street, Tulsa, Oklahoma**. Approximately five minutes later, investigators observed Soriano-Villareal exit an apartment in building 19 carrying a weighted plastic bag.

17.     On July 12, 2019, investigators observed Soriano-Villareal return to the Village East Apartment Complex. After a short period of time, investigators observed Soriano-Villareal exit an apartment in **building 19 at 11325 East 23rd Street**.

Approximately two minutes after Soriano-Villareal's departure, investigators observed a Hispanic male, later identified as Diego Carrillo-Lopez, walk from the direction of Apartment 6, building 19, at 11325 East 23rd Street carrying a weighted plastic bag. Carrillo-Lopez proceeded to enter into a Chevrolet Cruze bearing Oklahoma tag IND084. A records check reveals that the Chevrolet Cruze is registered to Diego Carrillo-Lopez at 11325 East 23rd Street, Apt. 6, Tulsa, Oklahoma. Following the identification of Carrillo-Lopez, investigators identified Carrillo-Lopez, David Hernandez-Perez, and Soriano-Villareal to visit the residence located at 11325 East 23rd Street, Apt. 6, frequently until recently.

18.     On July 23, 2019, investigators conducted a controlled purchase of heroin from Gil-Cardenas. During this operation, a law enforcement officer, acting in an undercover capacity (UC-2), contacted a Mexico-based "dispatcher" and arranged a purchase of heroin. The "dispatcher" directed UC-2 to go to the parking lot of the CVS pharmacy, located at 51st Street and Memorial Drive in Tulsa, Oklahoma. At approximately 12:46 p.m., investigators observed Gil-Cardenas drive through the CVS pharmacy parking lot. Gil-Cardenas ultimately parked in the Vasa Gym parking lot, which is located adjacent to the CVS pharmacy on the southwest corner of the intersection. UC-2 also travelled to the Vasa Gym parking lot and parked a few spots down from Gil-Cardenas. UC-2 proceeded to exit the UC vehicle and enter into the front passenger seat of Gil-Cardenas vehicle. After a couple of minutes, UC-2 exited Gil-

Cardenas' vehicle and entered back into the UC vehicle. At that time, UC-2 departed from the parking lot and physical surveillance of Gil-Cardenas was terminated. During the meeting with Gil-Cardenas, UC-2 purchased 10.7 grams of heroin in exchange for $700.00.

19.     On July 24, 2019, investigators conducted surveillance on Soriano-Villareal and observed him travel to Chuck E. Cheese in Tulsa, Oklahoma, and meet with the same courier he met with at Country Inn and Suites on July 9, 2019. Soriano-Villareal was observed driving his white Dodge Avenger bearing Oklahoma tag IND754. During the meeting, Soriano-Villareal received a large duffel bag from the courier's vehicle. After receiving the duffel bag, investigators followed Soriano-Villareal to his apartment at 7329 South Utica Avenue, Apt. 1014. Investigators observed Soriano-Villareal roll the duffel bag into apartment 1014.

20.     At the beginning of August 2019, investigators identified that Gil-Cardenas and Soriano-Villareal moved out of the residence at 7329 South Utica Avenue, Apt. 1014. At that time, investigators identified Soriano-Villareal to move to an apartment located at **11324 East 22nd Street, Apt. 10, Tulsa, Oklahoma**. Additionally, investigators identified Gil-Cardenas to move to an apartment located at **7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma**. Moreover, investigators observed Soriano-Villareal still frequented Gil-Cardenas residence at **7748 South Victor Avenue, Apt. B**. Based on my training and experience, I know cell-heads and their courier's to frequently

reside at different locations in order to separate the illegal narcotics from the drug proceeds. In this situation, I believe Soriano-Villareal and Gil-Cardenas began residing at separate locations in order to deter law enforcement detection.

21.    On August 6, 2019, investigators made plans for a law enforcement officer, acting in an undercover capacity (UC-3), to conduct a controlled purchase of heroin from the DTO. On that same date, UC-3 contacted a Mexico-based "dispatcher" and coordinated the controlled purchase in Tulsa, Oklahoma. The "dispatcher" directed UC-3 to wait in the area of 7th Street and Yale Avenue in Tulsa, for a gray Ford Fusion. Investigators established surveillance in the area and UC-3 observed a gray Ford Fusion bearing a paper tag arrive. UC-3 followed the gray Ford Fusion to the area of 500 South Erie Avenue, Tulsa, Oklahoma, where UC-3 entered into the front passenger seat of the gray Ford Fusion. Inside the vehicle, UC-3 met with Hernandez-Perez. During the meeting, UC-3 purchased approximately one gram of heroin from Hernandez-Perez in exchange for $100. After the meeting, UC-3 and Hernandez-Perez departed the area in separate directions. Investigators later observed that Hernandez-Perez obtained state of Oklahoma tag ING961 for his gray Ford Fusion. A records check reveals that on August 13, 2019, Oklahoma tag ING961 was issued to David Hernandez-Perez at **7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma**. Following the controlled purchase, investigators conducted a field test on the substance that Hernandez-Perez sold UC-3. The result of the field test was presumptive positive for heroin.

22.     On August 14, 2019, investigators made plans for UC-2 to purchase a quantity of heroin from Gil-Cardenas. On that date, UC-2 contacted the "dispatcher" and arranged to purchase heroin in Tulsa, Oklahoma. The "dispatcher" directed UC-2 to go to the parking lot of the Walgreens pharmacy, located at 31st Street and Garnett Avenue in Tulsa, Oklahoma. At approximately 12:22 p.m., investigators observed GPS location data on Gil-Cardenas' silver Hyundai Elantra to indicate that Gil-Cardenas was departing from his residence at **7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma**. Investigators maintained electronic surveillance on Gil-Cardenas and observed him travel directly to Walgreens pharmacy at 31st Street and Garnett Avenue. At approximately 12:48 p.m., upon Gil-Cardenas' arrival, UC-2 exited the UC vehicle and entered into the front passenger seat of Gil-Cardenas' silver Hyundai Elantra bearing a paper tag. After a short period, UC-2 exited Gil-Cardenas' vehicle, returned to the UC vehicle, and departed the area. During the meeting with Gil-Cardenas, UC-2 purchased 12.9 grams of heroin in exchange for $800.

23.     On August 26, 2019, investigators were conducting surveillance on Hernandez-Perez and Carrillo-Lopez. At approximately 7:30 p.m., investigators observed Hernandez-Perez and Carrillo-Lopez arrive to the Village East Apartment Complex and park in the area of building 19. Shortly thereafter, investigators observed Hernandez-Perez and Carrillo-Lopez enter into the apartment located at 11325 East 23rd Street, Apt. 6, Tulsa, Oklahoma.

24.     On August 28, 2019, at approximately 7:30 a.m., investigators observed GPS location data on Carrillo-Lopez' vehicle to indicate that he was located at the apartment at **7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma**. Subsequently, investigators established surveillance at the residence. At approximately 8:30 a.m., investigators observed Carrillo-Lopez and Hernandez-Perez exit the residence at **7321 South Utica Avenue, Apt. 913**, enter into Carrillo-Lopez' black Hyundai Azera and depart from the area.

25.     On that same date, investigators conducted surveillance on Soriano-Villareal's residence, located at **11324 East 22nd Street, Apt. 10, Tulsa, Oklahoma**. At approximately 4:22 p.m., investigators observed Soriano-Villareal walk into his apartment (**Apartment 10**) carrying multiple bags.

26.     On August 29, 2019, investigators made plans for UC-3 to execute a controlled purchase of heroin from the DTO. UC-3 contacted the Mexico-based "dispatcher" and requested to purchase a quantity of heroin. The "dispatcher" directed UC-3 to drive to 15th Street and Memorial Drive in order to meet with the courier. Investigators followed UC-3 to the area. UC-3 then placed an additional call to the "dispatcher" and was advised that a black Hyundai would arrive and deliver the heroin. At approximately 3:20 p.m., UC-3 met with Carrillo-Lopez in the area of 13th Street and South 93rd East Avenue. UC-3 entered into the front passenger seat of Carillo-Lopez' black Hyundai Azera bearing Oklahoma tag IND084 and met with Carrillo-Lopez.

During the meeting, UC-3 purchased approximately 13.21 grams of heroin in exchange for $800. Following the controlled purchase, investigators conducted a field test on the substance that Diego-Carrillo sold UC-3. The result of the field test was presumptive positive for heroin.

27.    On September 5, 2019, investigators monitored GPS location data on Hernandez-Perez' gray Ford Fusion. Investigators observed Hernandez-Perez to stay the night at his residence, located at **7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma**. At approximately 9:50 a.m., GPS location data indicated that Hernandez-Perez had departed from his residence at 7321 South Utica Avenue, Apt. 913. Investigators observed Hernandez-Perez to immediately drive to the area of 31st Street and South 129th East Avenue in Tulsa, Oklahoma. Upon arrival, GPS location data on Hernandez-Perez' gray Ford Fusion indicated that Hernandez-Perez drove through numerous neighborhoods in the area. Based on undercover controlled purchases during this investigation, I know Hernandez-Perez conducts his heroin transactions in neighborhoods throughout Tulsa, Oklahoma.

28.    Additionally, on that same date, investigators observed Gil-Cardenas had obtained state of Oklahoma tag INH808 for his silver Hyundai Elantra. A records check reveals that Oklahoma tag INH808 is assigned to Fernando Modesto Cazola at **7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma**.

29.   During the course of this investigation, investigators have conducted multiple surveillance operations on Tulsa-based members of the DTO. Surveillance has revealed that Soriano-Villareal, Gil-Cardenas, Hernandez-Perez, nor Carrillo-Lopez have a permanent job that they regularly report to. Additionally, investigators have observed Gil-Cardenas, Hernandez-Perez, and Carrillo-Lopez to spend the majority of their days delivering heroin to customers in the Tulsa, Oklahoma, area.

### 11324 EAST 22ND STREET, APT. 10, TULSA, OKLAHOMA

30.   During this investigation, surveillance has been conducted on Pablo Soriano-Villareal and he has been identified to permanently reside at the residence located at **11324 East 22nd Street, Apt. 10, Tulsa, Oklahoma**. As previously mentioned in this affidavit, Soriano-Villareal is the cell-head for the DTO in Tulsa, Oklahoma. Additionally, UC-1 picked up $70,000 U.S. Currency from Soriano-Villareal and investigators have observed him meet with a California based courier on multiple occasions and receive large duffel bags. On two prior occasions, Soriano-Villareal returned to his previous apartment, 7329 South Utica Avenue, Apt. 1014, after picking up large duffle bags from the currier, and on one of those occasions, investigators saw him wheel the large duffel bags to his previous apartment.

### 7748 SOUTH VICTOR AVENUE, APT. B, TULSA, OKLAHOMA

31.   During this investigation, surveillance has been conducted on Felix Gil-Cardenas. During surveillance, investigators have identified Gil-Cardenas to permanently

reside at the residence located at **7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma**. As previously mentioned in this affidavit, investigators have purchased quantities of heroin from Gil-Cardenas on multiple occasions.

## 11325 EAST 23RD STREET, APT. 6, TULSA, OKLAHOMA

32.     During this investigation, surveillance has been conducted at 11325 East 23rd Street, Apt. 6, Tulsa, Oklahoma. Investigators have observed Pablo Soriano-Villareal, David Hernandez-Perez, and/or Diego Carrillo-Lopez to come and go from this apartment daily.   On September 9, 2019, investigators observed Hernandez-Perez and Carrillo-Lopez to no longer frequent Apartment 6. On September 10, 2019, investigators served an Administrative Subpoena to the management at the Village East Apartment Complex where 11325 East 23rd Street, Apartment 6, is located. At that time, investigators learned that Hernandez-Perez and Carrillo-Lopez had "skipped out" (abandoned) on Apartment 6 and that management took possession of the apartment on September 9, 2019.

## 7321 SOUTH UTICA AVENUE, APT. 913, TULSA, OKLAHOMA

33.     During this investigation, surveillance has been conducted on David Hernandez-Perez and Diego Carrillo-Lopez. During surveillance, investigators have identified Hernandez-Perez and Carrillo-Lopez to permanently reside at the residence located at **7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma.** As previously mentioned in this affidavit, investigators have purchased quantities of heroin from

18

Hernandez-Perez and Carrillo-Lopez on multiple occasions. Additionally, investigators have identified Hernandez-Perez' vehicle to also be registered to apartment 913.

### 7325 SOUTH UTICA AVENUE, APT. 1001, TULSA, OKLAHOMA

34.     On September 10, 2019, U.S. Magistrate Judge Jodi Jayne, Northern District of Oklahoma, signed a search warrant authorizing investigators to execute search warrants at 11324 East 22nd Street, Apt. 10, Tulsa, Oklahoma, 7321 South Utica Avenue, Apt. 913, Tulsa, Oklahoma and 7748 South Victor Avenue, Apt. B, Tulsa, Oklahoma. Additionally, Judge Jayne signed arrest warrants for the arrest of Soriano-Villareal, Gil-Cardenas, Hernandez-Perez, and Carrillo-Lopez for Drug Conspiracy.

35.     On September 11, 2019, investigators executed the search warrants at 11324 East 22nd Street, Apartment 10, 7748 South Victor Avenue, Apartment B, and 7321 South Utica Avenue, Apartment 913. During the search warrant at 7748 South Victor Avenue, Apartment B, investigators located and arrested Soriano-Villareal on his outstanding arrest warrant. Additionally, investigators seized approximately 399.1 grams of heroin throughout the residence.

36.     During the search warrant at 11324 East 22nd Street, Apartment 10, investigators located and arrested Oscar Delgado-Trujillo in the bedroom of the apartment. During a search of apartment 10, investigators seized approximately 997.8 grams of heroin and a large sum of U.S. Currency. Additionally, after Delgado-Trujillo's Miranda warning, Delgado-Trujillo advised that he had arrived to Tulsa, Oklahoma, on

September 10, 2019, and that Soriano-Villareal had picked him up and took him to apartment 10.

37.     During the search warrant at 7321 South Utica Avenue, Apartment 913, investigators located and arrested Hernandez-Perez on his outstanding arrest warrant. Additionally, during a search of the apartment, investigators seized approximately 220.9 grams of heroin.

38.     During the execution of the three search warrants, investigators did not locate Carrillo-Lopez. However, investigators did observe Carrillo-Lopez' black Hyundai Azera bearing Oklahoma tag IND084 parked at the Park at Forest Oaks Apartment Complex, in the same area of the apartment at 7321 South Utica Avenue, Apartment 913. Following the execution of the search warrants, investigators established surveillance on Carrillo-Lopez' black Hyundai Azera. Furthermore, investigators made contact with apartment management and advised management of the outstanding arrest warrant for Carrillo-Lopez. Investigators asked if Carrillo-Lopez had recently rented an apartment in the complex. Apartment management recognized a photograph of Carrillo-Lopez and advised that at the beginning of September 2019 he had rented **apartment 1001**. Additionally, apartment management provided investigators with Carrillo-Lopez' lease contract. The lease contract reveals the following information:

- Party – Diego C. Lopez

- Address – **7325 South Utica Avenue, Apartment 1001, Tulsa, Oklahoma**

- <u>Lease Term</u> – September 3, 2019 – September 2, 2020.

39.     At approximately 11:00 a.m., investigators observed Carrillo-Lopez walk from the direction of **7325 South Utica Avenue, Apartment 1001,** and enter into his black Hyundai Azera. At that time, investigators arrested Carrillo-Lopez without incident.   Investigators searched Carrillo-Lopez and recovered two bundles of U.S. currency from his pants.  The bundles were in different pockets.

38.     Based on the foregoing information regarding surveillance, undercover heroin purchases, and other information developed during the investigation, together with my training and experience that individuals involved with drug trafficking organizations keep records and other indicia of their involvement in money laundering and drug trafficking at apartments they utilize. I believe that items listed on Attachment "B" will be found at the apartment in Carrillo-Lopez's name located at **7325 South Utica Avenue, Apt. 1001, Tulsa, Oklahoma**. All locations are within the Northern District of Oklahoma.

WHEREFORE, based on the foregoing, I believe there is probable cause to search the apartment in Carrillo-Lopez's name located at **7325 South Utica Avenue, Apt. 1001, Tulsa, Oklahoma**. This property is described in Attachment "A." Items described on Attachment "B" are evidence of crimes, fruits or instrumentalities of crimes and property designed for use, intended for use and used in committing crimes, relating to violations of

21

Title 21, United States Code, Sections 846 and 841(a) and respectfully request that a search warrant be issued.

_____
SA Taylor Wilson
Drug Enforcement Administration

Sworn and subscribed to before me this ‌‌11‌‌th‌‌ day of September, 2019.

_____
Jodi F. Jayne
United States Magistrate Judge

22